JOE ERVIN WALSH v. UNITED INSURANCE COMPANY OF AMERICA.

(Filed 24 November, 1965.)

**1. Insurance § 3—**

The rule that a contract of insurance must be construed strongly against insurer and liberally in favor of insured applies when the language of the policy is ambiguous or is susceptible of more than one construction and does not apply when the language of the policy is plain and unambiguous and susceptible of only one reasonable construction, in which event the courts will enforce the contract according to its terms.

**2. Insurance § 29—**

The provisions of a health policy that insured should be continuously confined within doors by sickness or disease in order to be entitled to specific benefits has been construed by the courts as descriptive of the extent of the illness rather than a restriction on insured's conduct or activities.

**3. Same— Evidence held to show defendant did not suffer confining illness as defined by the policy.**

The health policy in suit defined continuous confinement as one continuously confining insured within doors because of sickness, subject to the sole exception that the right to the benefits should not be defeated because insured should visit his physician for treatment or go to a hospital for treatment which could not be administered in insured's house. Insured's evidence disclosed total disability to carry on his business of farming, but also that during the period in question, consonant with his physician's instructions, insured took walks over level parts of his farm, took trips to the beach, and operated his automobile within reason. *Held:* Defendant's evidence negates continuous confinement as defined by the policy and nonsuit should have been entered in his action for special benefits for a confining illness.

APPEAL by defendant from *Pless, J.,* March, 1965 Session, CALDWELL Superior Court.

The plaintiff, Joe Ervin Walsh, instituted this civil action against United Insurance Company of America for the recovery of $2,735 allegedly due as sickness benefits under a policy of insurance providing coverage for accidents, sickness and hospitalization. The provisions of the policy pertinent to this inquiry are:

"SICKNESS BENEFITS
PART ELEVEN CONFINING TOTAL DISABILITY BENEFITS FOR LIFE — SICKNESS

"If 'such sickness' causes continuous total disability and total loss of time, and requires continuous confinement within doors and regular and personal attendance by a licensed physician, surgeon, osteopath or chiropractor, other than the Insured, the Company will periodically pay at the rate of the Monthly Benefit stated in the Policy Schedule for one day or more, beginning with the date of the first medical treatment during disability, so long as the Insured lives and is so disabled and confined, suffers such loss of time and requires such personal attendance.

"The term 'confinement within doors' where ever used in this policy, is hereby defined as confinement of the Insured continuously inside the house because of 'such sickness' except that the right of the Insured to recover under the policy shall not be defeated because he visits his physician for treatment or goes to a hospital for treatment when such treatment cannot be administered in the home of the Insured.

"PART TWELVE NON-CONFINING TOTAL DISABILITY BENEFITS FOR THREE MONTHS — SICKNESS

"If 'such sickness' does not require continuous confinement within doors but does cause continuous total disability and total loss of time and requires regular and personal attendance by a licensed physician, surgeon, osteopath or chiropractor, other than the Insured, the Company will periodically pay at the rate of the Monthly Benefit stated in the Policy Schedule, beginning with the date of the first medical treatment during disability, for the period the Insured is so disabled, suffers such loss of time and requires such personal attendance, but not exceeding three months for any one sickness."

The plaintiff seeks to recover under the continuous total disability, total loss of time, and *continuous confinement within doors* provisions of the policy. The plaintiff testified in substance and as

quoted that he became ill in April, 1962. Theretofore he had operated his 700-acre farm near the town of Lenoir. He cultivated crops, cut timber, kept approximately 200 head of cattle. "The circumstances surrounding my first illness and hospitalization in April of 1962 were that I hadn't been feeling good and had right smart of trouble with headaches. One morning about two o'clock, I woke up sick and I started to the bathroom and I fell, and just for a moment or so I was unconscious. That must have been when I hurt my elbow; and then I just taken cold chills and big beads of perspiration would pop out on me and then I would burn up. The next morning, I got my wife to drive me to the doctor, which was the occasion the doctor first testified to."

When asked to explain to the jury why he had not worked between April 16, 1962 and December 31, 1962, the plaintiff replied: "Because the doctor told me not to. As for my physical feelings during this period, if I would do a small amount of walking, my knees and legs would swell and I couldn't sleep at night and didn't feel good, and if I was to get the least bit hot, I would take a headache. When I was in the hospital one time, I got a headache and it took them 22 hours to get it stopped. During that period I did a whole lot of sleeping and sitting on the sun porch, and when I felt like it I would drive myself to the doctor, and when I didn't feel like it, he would give me a certain medicines and shots and he would tell me not to, and I would get somebody else to drive me. Most of the time on these occasions my wife would drive me—either her or my brother or her brother would be around to take me.     :

"Yes, I took a trip to Virginia Beach by car. My wife did most of the driving, but I drove some of the way. When we got there, I laid around on the beach and sat around the house. We stayed seven days, the best I remember, and then came back home. During this period I started retiring some of this land because I had more than I could take care of and I couldn't take care of it; but I did nothing with my own hands to earn any money." * * *

"I don't know how far Virginia Beach is from Lenoir, you will have to tell me because I do not remember the mileage. I do know we spent the night in Raleigh. I had a brother who is older than I am that had a house rented down there and he called me and told me to come and spend a week with him and it wouldn't cost me anything. Dr. Gibbons had told me before then to go and he has told me since then to go. He didn't say what beach to go to. I did go to Myrtle Beach.

"I drove part of the way to Virginia Beach, however far it was, and we went in one day and one night and stayed more than a week, I think it was ten days. I didn't go to the doctor while I was there or to the hospital because I get my prescriptions filled here and taken them with me."

Dr. J. J. Gibbons, admitted to be a medical expert specializing in general medicine and surgery, testified: "In April of 1962 I had occasion to see the plaintiff, Mr. Joe Walsh, in my office at the Dula Hospital. The date was April 16, 1962. I examined him at that time in the out-patient department of my office and he was admitted to the hospital for further study. The records at that time show that he had hypertension, high blood pressure, with some mild generalized arteriosclerosis (hardening of the arteries). Also at that time he was treated for a recent injury to his left elbow, which was thought to be primarily a contusion bruise type of injury. He was found to have a mild form of hypothyroidism — that is a deficiency of the thyroid gland, and an elevated blood cholesterol. The patient was obviously somewhat agitated and anxious. This was essentially the findings on this admission. X-rays were taken on that admission of the chest, left elbow, skull, sinuses, and of the abdomen. A note was made here of findings in the lower back that he was found to have osteo-arthritic changes — that is, a degenerative type of arthritis. He was in the hospital from the 16th to the 19th, four days. Tests were done for his kidneys, what we call an IRV paralgram, and that was essentially within normal limits; did not show any specific thing. The blood nitrogen, urea nitrogen, was up slightly. That is another test for kidney function. That was elevated slightly. He was dismissed on the 19th of April."

"Q. What instructions, if any, did you give him at that time with regard to his work, Doctor?"

"A. I felt, in view of the elevated blood pressure and the severe associated anxiety, that the man should definitely be observed for a while — rest and convalescence, and so he was advised at that time. He was followed along very closely thereafter.

"He was advised at that time not to work. Prior to this time I had not treated Mr. Walsh as a physician. . . . This 54 year old white male with anxiety and anxiety state with agitated depressive reaction . . . gastroduodenitis with an incipient duodenal ulcer, hypertensive cardiovascular disease, with slight generalized arteriosclerosis, hypothrophis arthritis of his entire back and hypocholesterol anemia due to mild hypothyroidism, was admitted, treated, discharged much improved. . . . I specified that he go to

the seacoast for a multiple of reasons — one, for the allergy, and the other being the arthritis; and an additional reason: the agitated depressive type of nervousness he portrayed. * * *

"From April until June, I never restricted him to walk short distances, and as long as his blood pressure was staying within limits, I never considered him disabled from driving his car a reasonable distance, although on occasions I had restricted that because at times when he was running 190 and 190 blood pressure, I felt it was a little unwise. His wife had driven him on those occasions; I know that to be a fact, but under ordinary circumstances he was able to drive his car. . . . It was hilly where he lived, so I limited him on his walking around his farm because we do have evidence on the cardiogram that he had some early mild cardiac heart muscle changes so that very definitely (he) was restricted. * * *

"This plaintiff was very definitely authorized and told to report in at frequent intervals for these continued check-ups during the period in question. I instructed him in the same period to get out for short walks on flat land, without climbing. It was good for his health and circulation and good for his arthritis. My instructions to him with reference to his participation in farm operations remained the same constantly throughout."

The doctor further testified: "In my opinion, he was disabled, totally, from farming."

The parties, by stipulation, identified and put in the record the policy, admittedly in force during the period involved.

The defendant, without offering evidence, moved for judgment of nonsuit which the court denied. The defendant excepted. The jury answered the issue of total disability and continuous confinement within doors in favor of the plaintiff and allowed recovery in the sum of $2,550.00. From the judgment on the verdict, the defendant appealed.

*Ted G. West, Marvin Wooten for plaintiff appellee.*
*Townsend & Todd by James R. Todd, Jr., for defendant appellant.*

HIGGINS, J. In construing insurance contracts the courts generally take into account the fact that the contracts are carefully drawn by lawyers representing the insurance companies and the coverage is sold by skillful agents to individuals who are unfamiliar with the niceties of insurance law. By reason of the position of the parties, the courts construe the contracts most strongly against the insurer and most liberally in favor of the insured. *Electric Co. v. Ins. Co.,* 229

N.C. 518, 50 S.E. 2d 295; *Glenn v. Ins. Co.*, 220 N.C. 672, 18 S.E. 2d
113; *Duke v. Assurance Corp.*, 212 N.C. 682, 194 S.E. 91; *Jolley v.
Ins. Co.*, 199 N.C. 269, 154 S.E. 400; *Underwood v. Ins. Co.*, 185 N.C.
538, 117 S.E. 790; *Banks v. Ins. Co.*, 95 U.S. 673. This rule applies
where the language used is ambiguous or is susceptible of more than
one construction. However, it is generally held, certainly by this
Court, that where the language of an insurance policy. is plain, un-
ambiguous, and susceptible of only one reasonable construction, the
courts will enforce the contract according to its terms. *Huffman v.
Ins. Co.*, 264 N.C. 335, 141 S.E. 2d 496; *Hardin v. Ins. Co.*, 261 N.C.
67, 134 S.E. 2d 142; *Parker v. Ins. Co.*, 259 N.C. 115, 130 S.E. 2d 36.

For many years the courts have been construing confinement ex-
clusively within doors provisions of health policies and many, includ-
ing our own, have held that continuous confinement within doors
clauses shall be construed as descriptive of the extent of the illness
or injury rather than a restriction on the insured's conduct or ac-
tivities. *Glenn v. Ins. Co., supra; Mutual Benefit Health and Acci-
dent Association v. Cohen*, 194 Fed. 2d 232, 8th Ct., *Cert. denied*, 243
U.S. 965, 96 L. Ed. 1362; *Occidental Life Ins. Co. v. Sammons*, 271
S.W. 2d 922 (Ark.); *Struble v. Occidental Life Ins. Co.*, 120 N.W. 2d
609 (Minn.); *Suits v. Ins. Co.*, 249 N.C. 383, 106 S.E. 2d 579.

This case differs from all others in this one material respect: here-
tofore all courts have placed their own interpretations on the contin-
uous confinement within doors clauses, giving the insured the bene-
fit of the most liberal construction possible. This, however, is the
only case insofar as our research has disclosed that the parties have
agreed and placed in the contract their interpretation of what the
clause means. The parties hereto have agreed that the clause means
"confinement of the Insured continuously inside the house because
of such sickness, except that the right of the Insured to recover under
the policy shall not be defeated because he visits his physician for
treatment or goes to the hospital for treatment when such treatment
cannot be administered in the *house* of the Insured." (emphasis
added.)

In this case the plaintiff's medical evidence shows total disability
to carry on the business of farming. The plaintiff's doctor testified
that he advised reasonable activity — walks over the level parts of
the farm, trips to the beach, reasonable operation of an automobile,
etc. The insured admitted he engaged in the permitted activities. By
these admissions the plaintiff excludes himself from coverage under
the continuous confinement within doors provision of the policy. An-
other section of the policy (not here involved) furnishes coverage

for total disability. The right of recovery in this action, however, required the plaintiff to show that his disability has confined him continuously within doors which, by agreement of the parties means inside the house except for visits to his doctor or to the hospital for treatment which cannot be "administered in the house of the Insured." The parties having thus agreed, so shall they be bound.

The court should have granted the motion for nonsuit. This decision renders it unnecessary to pass on the defendant's request for special instructions or to the form of the issues submitted. The judgment of the Superior Court of Caldwell County is

Reversed.